

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jabob K. Javitz Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*


April 1, 2026


<u>By ECF</u>
The Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

<blockquote>Re:    <i>United States v. Felipe Estrada Echeverry</i>,
       S6 24 Cr. 133 (MKV)</blockquote>

Dear Judge Vyskocil:

The Government respectfully submits this letter in advance of the sentencing of defendant Felipe Estrada Echeverry, a/k/a "Pepe," scheduled for April 8, 2026. The defendant pled guilty pursuant to a plea agreement to operating an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960(b)(1)(C) and 2. As described in more detail below, for years, the defendant operated an unlicensed money services business as part of a money laundering network that operated in the United States and Colombia. As part of this network, the defendant controlled and operated multiple shell companies and bank accounts in Colombia to receive millions in criminal proceeds. For the reasons further discussed below, the Government believes that a Guidelines sentence of 60 months' imprisonment would be sufficient, but not greater than necessary to satisfy the goals of sentencing.

## I.  Background

### A.  Overview of the Money Laundering Network

Since at least January 2020, a money laundering network (the "Network") has operated in the United States and Colombia, among other countries, to launder the proceeds of illicit activity, including drug trafficking, through the U.S. financial system to Colombia, among other countries. (PSR ¶¶ 28-29). The Network was sophisticated, and members had different roles to facilitate each step of the laundering process. (PSR ¶ 30). Specifically, the Network had the following positions and operated as follows: Main Providers or their partners converted illicit proceeds (such as from drug trafficking or fraud) that were located outside of Colombia (such as in the United States or Mexico) to USDT (referred to as Tether), a cryptocurrency stablecoin pegged to the United States dollar. (PSR ¶ 30(i)). Main Providers, or their partners, typically purchased the USDT below market value (*i.e.*, at the largest discount or most favorable exchange rate) because the funds were

more closely tied to the underlying activity. (PSR ¶ 30(i)). Main Providers worked with Providers to send the USDT to a Facilitator. (PSR ¶ 30(ii)). The Facilitator sent the USDT to a U.S. Client who acted as an over-the-counter cryptocurrency exchange and converted the USDT back to fiat currency. (PSR ¶ 30(ii)). U.S. Clients then wired the fiat currency (less a commission) to shell companies in Colombia that were managed by Colombian Clients—like the defendant. These wires were often sent pursuant to fake technology services contracts to justify the wires to Colombian banks. (PSR ¶ 30(iii)). Colombian Clients, like the defendant, then used their Colombian shell companies to transfer money to other Colombian shell companies for the funds to eventually be withdrawn and delivered to Main Providers or their associates. (PSR ¶ 30(iv)).

In total, the Network is responsible for laundering hundreds of millions of U.S. dollars in this fashion. (*See* PSR ¶¶ 11, 37, 47).

### B. Offense Conduct: The Defendant's Role in the Network

As charged, between May and November 2023, the defendant worked with co-defendants Maximilien de Hoop Cartier ("Cartier"), Leonardo Zuluaga Duque ("Zuluaga"), Erica Lopez Ortiz ("Lopez"), a confidential source ("CS-1"), and others to move the proceeds of illicit activity through the Network. (PSR ¶¶ 36-49). During this time, the defendant acted as the Colombian Client, Zuluaga acted as the Main Provider, Lopez acted as the Provider, Cartier acted as the U.S. Client, and CS-1 acted as the Facilitator. In other words, Zuluaga and Lopez sent USDT representing the proceeds of illicit activity to CS-1, CS-1 sent this USDT to Cartier, Cartier converted the USDT to U.S. dollars and wired the funds to the defendant, and the defendant distributed the funds to accounts in Colombia to be withdrawn and delivered back to Zuluaga and Lopez. (PSR ¶ 26).

After converting the USDT to fiat, Cartier used one of his U.S.-based shell companies, Bullpix Solutions LLC ("Bullpix"), to transfer the funds (in U.S. Dollars) to companies the defendant controlled in Colombia, including Big Data Technology S.A.S. ("Big Data"), Maphing Ideas S.A.S. ("Maphing"); and Totenic SAS ("Totenic"). (PSR ¶¶ 24, 37-38). To make these wires appear legitimate, the defendant and Cartier executed fake technology services contracts in the names of their companies. (PSR ¶¶ 30, 43). Specifically, in April and May 2023, the defendant sent three contracts to CS-1 to be transmitted to Cartier for Big Data, Maphing, and Totenic to purportedly provide certain services to Bullpix. (PSR ¶ 44).

The contracts all had the same title ("Software Engineering Contract") and object ("Software architecture tailored to client needs, leveraging the software engineer's capabilities in the planning, analysis, design, and programming of specialized software.") and were nearly identical except for the names of the parties, the companies, and the signatures.[1] (PSR ¶ 44). In addition, the defendant asked Cartier (through CS-1) to complete additional documents for the contract between Big Data and Bullpix, which the defendant was required to submit to his banks in Colombia. For example, on or about April 12, 2023—the day after Bullpix executed the contract with Big Data—the defendant asked Cartier to complete a declaration regarding the origin of the

---

[1] The contracts and conversations between CS-1 and Estrada were in Spanish but have been translated to English as part of this investigation.

funds and then instructed Cartier (through CS-1) how to complete the declaration, including that the source of the funds should be listed as "technology related business" or "technology related activity."

The defendant also instructed Cartier (through CS-1) regarding how to distribute the wire transfers amongst the defendant's Colombian companies. Once the defendant received wires from Cartier, he then transferred the funds to other Colombian companies so that the funds could be withdrawn in Colombian Pesos and distributed back to Zuluaga and Lopez. For example, on or about June 6, 2023, the defendant sent a photo to CS-1, which showed that Totenic had transferred 125,048,074 Colombian Pesos to a company controlled by Lopez.

In these roles and pursuant to these contracts, the defendant moved approximately $10 million with Cartier, Zuluaga, and Lopez between May and November 2023, which he knew to be criminal proceeds.

### C.  Relevant Conduct: The Defendant's Prior Conduct with the Network

The defendant began working with Cartier and the Network in early 2020. (PSR ¶ 34). For example, in May 2020, Estrada emailed two unsigned phony contracts to Cartier: one was between Big Data and Softmill LLC ("Softmill") (*see* PSR ¶ 24(iv)) and another between Big Data and AZ Technologies LLC (*see* PSR ¶ 24(iii)).[2] Like the phony contracts discussed above, these contracts, which were purportedly "IT Services Agreements," were nearly identical except for the dates, prices, companies, and parties. In addition, messages exchanged between CS-1 and Estrada, and Cartier and Estrada, make clear that Estrada and Cartier worked together to move money since at least 2020.

Bank records additionally reflect that Big Data received approximately $6.75 million from Bullpix, VC Innovated, Softmill, and AZ Technologies between February 2020 and April 2023.

### D.  The Charges and the Defendant's Plea

The defendant was charged in April 2024 in an S2 superseding indictment with conspiracy to commit money laundering from at least in or about May 2023 through at least in or about November 2023. On April 30, 2024, the defendant was arrested in Medellin, Colombia, and was held in Colombian custody until he was extradited to the United States on May 16, 2025.

On December 11, 2025, the defendant waived indictment and pled guilty, pursuant to a written plea agreement, to a one-count superseding felony information charging the defendant, from May 2023 through at least November 2023, with controlling and operating a money transmitting business, which he knew to be transmitting criminal proceeds in violation of 18 U.S.C. §§ 1960(b)(1)(C) and 2.  The defendant admitted in his plea allocution that he knew "the funds that were being transmitted to and from [his] business were derived from criminal activity," and that he knew "what [he] did was wrong and illegal." (Plea Tr. 39.)

---

[2] The email and contracts are attached here as Exhibit A.

### E.  The Guidelines Range

The Probation Office calculates the defendant's advisory Guidelines range as follows, a calculation matching that in the plea agreement and with which the Government agrees.  The defendant has a total offense level of 29 as a result of:

(i)     a base offense level of 28 because the offense involved more than $9,500,000 and less than $25,000,000, pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(K);

(ii)    four levels were added pursuant to U.S.S.G. § 2S1.1(b)(2)(C) because the defendant was in the business of laundering funds;

(iii)   two levels were added because the offense involved sophisticated money laundering, pursuant to U.S.S.G. § 2S1.1(b)(3)(B);

(iv)    two levels were subtracted because the defendant met the criteria for an adjustment for a zero-point offender, pursuant to U.S.S.G. § 4C1.1; and

(v)     three levels were subtracted for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

The defendant has zero criminal history points, and therefore is in Criminal History Category I. Based on these calculations, the guideline imprisonment range is 87 months to 108 months. However, the statutorily authorized maximum sentence of five years is less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 60 months. USSG §5G1.1(a).

### F.  The Probation Office's Recommendation

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, his health, the nature and circumstances of his offense, and the objectives of punishment, deterrence, and promotion of respect for the law, the Probation Office recommends a sentence of 36 months' imprisonment. (PSR at 29). The Probation Office's recommendation is significantly below the Guidelines range and the mean and median length of imprisonment imposed for the defendant's offense level and criminal history, which are 63 months and 70 months, respectively. (PSR at 27).

## II.    Discussion

### A.  Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007).  It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into

account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B. A Guidelines Sentence Is Warranted

The factors set forth in 18 U.S.C. § 3553(a) strongly weigh in favor of a significant term of imprisonment, consistent with the Guidelines.

*First*, the seriousness of the offense warrants such a sentence. See 18 U.S.C. § 3553(a)(2)(A). As described above, for years, the defendant ran a money transmitting business that laundered millions of dollars of crime proceeds. The defendant played a critical role in the charged money laundering network, receiving United States dollars into Colombian bank accounts and then transferring and withdrawing the funds in Colombian Pesos to send back to Providers, like Zuluaga and Lopez. The defendant's conduct caused substantial harm—facilitating unlawful enterprises, undermining the integrity of the U.S. financial system, and impeding the ability of law enforcement to trace ill-gotten funds.

*Second*, the history and characteristics of the defendant and the nature and the circumstances of the offense warrant such a sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendant did not engage in laundering of funds fleetingly. He did so for years, in sophisticated ways, and without any apparent hesitation. Indeed, it is apparent that he spent significant time thinking about how to conceal what he was doing, creating multiple companies, and preparing phony contracts.

*Finally*, the need for general deterrence strongly weighs in favor of such a sentence. *See* 18 U.S.C. § 3553(a)(2)(B). As described above, the defendant made it difficult to detect his scheme timely or to uncover its full scope. When such a scheme is successfully prosecuted, a substantial sentence is warranted. *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The defendant's suggestion that he need not be sentenced to any prison time whatsoever to achieve robust general deterrence (Def. Ltr. 7-8) flies in the face of case law, logic, and human experience.

**E.       Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of 60 months' imprisonment.

Very truly yours,

JAY CLAYTON
United States Attorney

By:  _____/s/_____
     Jennifer N. Ong/ Eli J. Mark
     Assistant United States Attorneys
     (212) 637-2224/2431

cc: Lorraine Gauli-Rufo (by ECF)